# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

STEVEN CROFOOT, §
 §
    *Plaintiff,* §
 §
*versus* § CIVIL ACTION NO. 1:12-521
 §
CAROLYN W. COLVIN, §
Acting Commissioner of §
Social Security,[1] §
 §
    *Defendant.* §

## REPORT AND RECOMMENDATION

Steven Crofoot ("Crofoot") brings this action under 42 U.S.C. § 405(g), seeking review of an adverse decision on his application for disability-based benefits under the Social Security Act. Complying with General Order # 18 (Dkt. No. 3), the parties join issues through competing briefs.[2]

A reviewing court's limited role is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence.[3] *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503,

---

[1]     Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin, Acting Commissioner of Social Security, should be substituted for Michael J. Astrue as defendant.

[2]     *See* General Order #18 dated September 23, 2003 (superseding January 24, 2002 and September 19, 2001 general orders). (Dkt. No. 3).

[3]     "Substantial evidence" is a term of art. It means less than a "preponderance" (usual standard in civil cases), but "more than a mere scintilla," or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

507 (2d Cir. 2009), *cert. denied*, ___U.S.___, 130 S. Ct. 1503 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Reviewing courts cannot retry factual issues *de novo* or substitute their interpretations of administrative records for that of the Commissioner when the record contains substantial support for the decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). Neither can reviewing courts overturn the Commissioner's administrative rulings because they would have reached a different conclusion had the matter come before them in the first instance. *See Campbell v. Astrue*, 465 Fed. App'x 4, 5 (2d Cir. 2012).

## I. Background

Crofoot's application claimed disability beginning on September 1, 2008, due to limitations stemming from pain in his shoulders, neck and back, as well as a hearing impairment. (T. 193, 197).[4] Administrative law judge, Robert Gonzalez ("ALJ Gonzalez"), conducted two evidentiary hearings, and eventually denied Crofoot's application. (T. 14-21). After unsuccessfully requesting Appeals Council review, Crofoot timely instituted this proceeding. (Dkt. No. 1).

## II. Commissioner's Decision

ALJ Gonzalez utilized a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just way for determining disability applications in conformity with the Social Security Act. *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)). A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of*

---

[4]    "T." followed by a number refers to the page of the administrative record. (Dkt. No. 9).

*Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

Crofoot carried his Step 1 and Step 2 burdens to show that he has not engaged in substantial gainful activity since his alleged onset of disability, and has several "severe" impairments.[5] (T. 16). ALJ Gonzalez declined, however, to include among these impairments Crofoot's alleged *hearing impairment* and *sleep apnea.* ALJ Gonzalez found Crofoot's hearing not a medically determinable impairment, and he excluded sleep apnea as being diagnosed "well after the date last insured and there is no evidence that the claimant had this condition prior to his date last insured." (T. 16-17).[6]

At Step 3, ALJ Gonzalez found that Crofoot's impairments do not meet or equal a presumptively disabling condition. (T. 17).[7] Given these initial findings, ALJ Gonzalez was required to assess Gonzalez's "residual functional capacity" before proceeding to remaining steps.[8]

In that respect, ALJ Gonzalez found that Crofoot's ability to perform work-related activities is reduced to the "light" exertional level[9] with several

---

[5]     "Severe" is a term of art.  *See* 20 C.F.R. § 404.1520(c).

[6]     For practical effect of this finding, *see* footnote 23, *infra*.

[7]     20 C.F.R. Part 404, Subpart P, Appendix 1, lists impairments the Commissioner considers severe enough to prevent an individual from doing gainful activity, regardless of age, education or work experience.  20 C.F.R. § 404.1525(a).

[8]     This term refers to what claimants can still do in a work setting despite their physical and/or mental limitations caused by their impairments and any related symptoms, such as pain.  *See* 20 C.F.R. § 404.1545; *see also Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (defining RFC).

[9]     "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).  "[T]he full range of light work requires standing or walking, off and on, for a total of approximately [six] hours of an [eight]-hour workday." SSR 83-10, Titles II And XVI: Determining Capability To Do Other Work-The Medical-Vocational"Rules Of Appendix 2, 1983 WL 31251, at **5-6 (SSA 1983).

limitations that preclude his performance of a full range of light work. Those limitations are: work entailing (a) reaching overhead with left upper extremity only frequently, (b) occasional postural positions, (c) no concentrated exposure to respiratory irritants and (d) no dangerous conditions. (T. 17). In making this assessment, ALJ Gonzalez rejected some of Crofoot's subjective testimony regarding persistence, intensity and limiting effects of his symptoms. (T. 17, 20).

At Step 4, ALJ Gonzalez determined that Crofoot's impairments do not prevent him from performing his past relevant work as a real estate agent. (T. 20). ALJ Gonzalez relied on the Dictionary of Occupational Titles ("DOT"), Code 250.359-018,[10] which classifies work as a real estate agent as light, and does not involve overhead reaching with the upper extremities, frequent postural positions, or exposure to irritants or dangerous conditions. *Id.*

Based on all these findings, ALJ Gonzalez concluded that Crofoot was not disabled, and his application for benefits was, therefore, denied. *Id.*

## III. Contentions

Crofoot contends that the Commissioner's decision is tainted by a legal error, and that critical findings regarding residual functional capacity and ability to perform past relevant work are not supported by substantial evidence. (Dkt. No. 11, pp. 9-19). Specifically, Crofoot asserts the following points of error:

- the ALJ erred in failing to request a medical opinion from Plaintiff's treating physician Dr. Rametta;

- the ALJ's RFC determination is unsupported by substantial evidence;

---

[10]    There is a scrivener's error in citation to DOT Code 250.359-018. The code for "sales agent, real estate agent" is 250.357-018. *See* Dictionary of Occupational Titles, Code 250.357-018, 1991 WL 672361 (4th ed. 1991).

- the ALJ's credibility finding is unsupported by substantial evidence; and

- the ALJ's Step 4 determination is unsupported by substantial evidence.

(*Id.*, at p. 1). The Commissioner counters that appropriate legal standards were used by ALJ Gonzalez and his decision is supported by substantial evidence. (Dkt. No. 13, pp. 12-21).

## IV.  Point One:  Adequacy of the Administrative Record

Crofoot first argues that ALJ Gonzalez violated his legal duty to develop the record by failing to request a "medical source statement" from Dr. Concetto Rametta, M.D., Crofoot's treating physician, (Dkt. No. 11, pp. 9–12).  Although ALJ Gonzalez received and reviewed Dr. Rametta's *treatment notes* and *records*, Crofoot argues that he also should have solicited Dr. Rametta's *forensic opinions* regarding Crofoot's capacity to perform various ordinary physical functions relevant to substantial gainful employment.

### A.  *Duty to Develop a Full Record*

"Social Security disability determinations are investigatory, or inquisitorial, rather than adversarial." *Moran v. Astrue*, 569 F.3d 108, 112–13 (2d Cir. 2009) (internal quotation marks omitted). "It is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Id.* (internal quotation marks omitted); *accord Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999). "Accordingly, an ALJ may not rely, as factfinders in adversarial proceedings customarily do, on the *absence* of probative evidence supporting the opinions of a claimant's expert, without making an affirmative effort to fill any gaps in the record before him." *Sanchez*

*v. Barnhart*, 329 F. Supp.2d 445, 450 (S.D.N.Y. 2004) (emphasis in original) (internal quotation marks and citations omitted).

Instead, ALJs must make "every reasonable effort to help [the claimant] get medical reports from [his or her] own medical sources." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (quoting 20 C.F.R. § 404.1512(d)); *see also Streeter v. Commissioner of Soc. Sec.*, No. 5:07–CV–858, 2011 WL 1576959, at *3 (N.D.N.Y. Apr. 26, 2011) (ALJ must "make reasonable efforts to obtain the claimant's treating physician report."). Thus, when evidence in hand is inadequate to determine whether a claimant is disabled, an administrative law judge should re-contact the treating physician or other medical sources and request additional records. 20 C.F.R. §§ 404.1512(e), 404.1520(c); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (when there is an inadequate medical record, an administrative law judge must *sua sponte* seek additional information).

This duty to develop the record, however, is not infinite. *See Guile v. Barnhart*, No. 5:07–cv–259, 2010 WL 2516586, at *3 (N.D.N.Y. June 14, 2010); *see also* 20 C.F.R. § 404.1512(d) (stating that generally, a complete record contains a "medical history for at least the [twelve] months preceding the month in which" the claimant files his application). When all of the evidence in hand is consistent and sufficient to determine whether a claimant is disabled, further development of the record is unnecessary, and a determination can be made based upon that evidence. *See* 20 C.F.R. § 404.1520b(a). When there are no "obvious gaps" in the record, there is no duty to seek additional information. *Rosa v. Callahan*, 168 F.3d 72, 79 n. 5 (2d Cir. 1999); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c) (additional evidence – including recontacting medical sources – only when judge cannot decide whether a claimant is disabled based on existing evidence); *Hart v. Commissioner of Soc. Sec.*, No. 5:07–CV–1270

(DNH), 2010 WL 2817479, at *5 (N.D.N.Y. July 10, 2012) (when there is sufficient evidence to make a determination, an administrative judge is not obligated to again contact a medical source).

## B. *Application and Analysis*

Crofoot's brief cites several cases that express widespread agreement that obtaining a treating physician's medical source statement containing opinions regarding a claimant's ability to perform specific physical functions is a "best practice." (Dkt. No. 11, pp. 10-11). None, however, establishes an absolute requirement that an administrative law judge always must obtain such a statement. Indeed, the clear weight of authority is to the contrary.[11] Thus, without more, mere absence of a treating physician medical source statement is neither legal error nor a ground for reversal. Rather, reversal is warranted only when an administrative law judge fails to meet the standards articulated in the preceding section.

The record here was sufficiently robust for ALJ Gonzalez to make a disability determination without requesting an additional medical source statement from Dr. Rametta. First, the record contains Dr. Rametta's treatment notes.[12] Second, ALJ Gonzalez obtained specific medical source

---

[11] "[L]ack of a medical source statement will not make the record incomplete" when the ALJ's decision is "based on sufficient and consistent evidence." *Streeter v. Commissioner of Soc. Sec.*, 2011 WL 1576959, at *3 (internal quotation marks and citations omitted); *see also Tankisi v. Commissioner of Soc. Sec.*, No. 12-1398-cv, 2013 WL 1296489, at *4 (2d Cir. Apr. 2, 2013) (holding inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing RFC where the voluminous medical record assembled by Plaintiff's counsel was adequate to permit an informed finding by the ALJ).

[12] Dr. Rametta, who practices internal medicine, treated Crofoot for a variety of conditions from 1994 through February 2004. (T. 475-480, 510-26, 531-39). In July 2008, Dr. Rametta resumed treatment, noting that he had not seen Crofoot in some time. (T. 474). Thereafter, Dr. Rametta treated Crofoot in August 2008, October 2008, December 2008, February 2009, April 2009, May 2009, July 2009, October 2009, January 2010, and September 2010. (T. 470-74, 751-57).

statements from consultative examiners, Dr. Alex Gindes, Ph.D.[13] and Dr. Suraj Malhotra, M.D.,[14] as well as mental and physical capacity assessments by state disability analysts.[15] Third, ALJ Gonzalez also received into evidence and considered diagnostic and treatment records from several additional medical sources including: Dr. Nancy Linneman, M.D.,[16] Dr. Carmen Martinez, M.D.,[17] Dr. Daniel Tomlinson, M.D.,[18] Dr. Thomas Booker, M.D.,[19] Dr. Sherma Winchester-Penny, M.D.,[20] and Dr. William Gostis, M.D.[21]

Crofoot proffers no plausible suggestion that this record contains obvious gaps or inconsistencies that prevent a fully-informed decision. Neither does Crofoot point to anything helpful or significant that treating physician Rametta could have added, nor does evidence before ALJ Gonzalez give any hint

---

[13]     In May 2009, at the request of the Commissioner, Dr. Gindes, a psychologist, performed a psychiatric evaluation of Crofoot. (T. 677-80).

[14]     In May 2009, at the request of the Commissioner, Dr. Malhotra, an orthopedic surgeon, performed an orthopedic examination of Crofoot. (T. 686-91).

[15]     On June 29, 2009, state disability psychological analyst, J. Dambrocia, prepared a psychiatric review technique form (T. 692-705) and a mental RFC assessment (T. 706-08). On July 15, 2009, state disability analyst, C. Rosney, prepared a physical RFC assessment. (T. 712-717).

[16]     On January 25, 2005, Dr. Linneman, a pulmonologist, had a pulmonary consultation with Crofoot to evaluate complaints of sleep apnea. (T. 622-24).

[17]     In April 2009, Dr. Martinez, a neurologist, consulted with Crofoot regarding complaints of neck pain. (T. 761-64, 880-83).

[18]     In April, June, and August 2009, Dr. Tomlinson, an orthopedic surgeon, consulted with Crofoot regarding complaints of left shoulder pain. (T. 726-29, 730-32, 835-37, 870-72, 875-77).

[19]     In June and August 2009, Dr. Booker, who practices physical medicine and rehabilitation, consulted with Crofoot regarding complaints of neck and left arm pain. (T. 723-25, 839-41, 858-61).

[20]     In November 2009, and January 2010, Dr. Winchester-Penny, a cardiologist, treated Crofoot for follow-up evaluation and complaints of chest pain. (T. 802-03, 817-18).

[21]     In February 2010, Dr. Gostis, a cardiologist, consulted with Crofoot regarding complaints of chest pain. (T. 792-94).

of such. Rather, Dr. Rametta did not report that Crofoot had any significant complaints; noted Crofoot was taking no medications; reported that a review of Crofoot's systems was "otherwise negative;" and made benign physical examination findings. (T. 751-57). Finally, no other doctor expressed an opinion or made diagnostic findings that Crofoot's medical problems prevent him from working.

Careful review discloses that ALJ Gonzalez developed a record sufficient to permit an informed finding as to a disability determination. Crofoot's argument to the contrary should be rejected.

## V. Point Two: Weighing the Medical Evidence

ALJ Gonzalez determined that Crofoot retains physical capacity for light work with certain limitations described earlier. This point of error challenges ALJ Gonzalez's weighing of the medical evidence as it relates to Crofoot's *physical* abilities. Crofoot argues that his assessment is not supported by substantial evidence because it (a) failed to consider effects of and was based on incorrect factual findings with respect to Crofoot's sleep apnea, and (b) consists of improper lay interpretation of the medical evidence of record.[22]

*A. Physical Residual Functional Capacity Determinations*

When determining residual functional capacity, administrative law judges decide whether applicants, notwithstanding their impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis. See SSR 96–8p, TITLE II

---

[22] Crofoot argues that this error is compounded by the fact that ALJ Gonzalez failed to request a treating source opinion of Crofoot's limitations. That argument was addressed and rejected earlier, and is not revisited here.

AND XVI: Assessing Residual Functional Capacity in Initial Claims, 61 Fed. Reg. 34474, 1996 WL 374184, at *4 (SSA July 2, 1996). The Commissioner provides detailed guidance for claims adjudicators in the form of both a formal regulation and an internal policy ruling. Collectively, these directives (a) identify various ordinary physical functions to be considered in context of an ordinary work schedule, (b) require function-by-function assessments of those activities, and (c) dictate that ultimate RFC determinations account for limitations imposed by both severe and non-severe impairments. *See* 20 C.F.R. §§ 404.1545(a)(2), 404.1545(b); SSR 96–8p, 1996 WL 374184, at **5, 7.

B.    *Application and Analysis*

At Step 3, ALJ Gonzalez stated that he considered all impairments, singly and in combination. (T. 17). When determining Crofoot's residual functional capacity before turning to Step 4 of the sequential evaluation process, ALJ Gonzalez acknowledged that he was required to consider all of Crofoot's impairments, including those that are not severe. (T. 15). In addition, ALJ Gonzalez stated that he considered all symptoms and gave careful consideration of the entire record. (T. 17). He cited the applicable regulations and ruling that impose that duty. *Id*. This indicates his awareness of the correct legal standards, and provides a strong indication that he intended to apply them. Thus, there is no obvious legal error reflected in ALJ Gonzalez's decision.

1.    <u>Sleep Apnea</u>

ALJ Gonzalez did not include sleep apnea among Crofoot's severe impairments, nor did he factor sleep apnea into his assessment of Crofoot's

residual functional capacity because he concluded that there is no evidence that Crofoot had this condition prior to the date he was last insured.[23]

Crofoot argues that this factual finding is patently incorrect because there is evidence of sleep apnea in January, 2005, well *before* his date last insured (*i.e.*, December 31, 2009). (Dkt. No. 11, pp. 14-15). Crofoot was, indeed, referred for a Continuous Positive Airway Pressure ("CPAP") titration study in January, 2005, which was "notable for moderate obstructive sleep apnea syndrome with an AHI of 21.1 without significant accompanying hypoxemia." (T. 483).[24] (T. 622, 624).

ALJ Gonzalez, therefore, mistakenly found that there was no evidence of sleep apnea prior to December 31, 2009. This factual error, however, is of little consequence. There is no further evidence of either diagnosis or treatment for sleep apnea between Crofoot's alleged disability onset date in September, 2008, and his date last insured on December 31, 2009. Crofoot obviously managed without further sleep apnea treatment for three years before claiming disability in 2008. Then, when asked to list all illnesses, injuries, or conditions that limit his ability to work, he did not mention sleep apnea. (T. 197). No treatment notes post 2008 reveal sleep apnea as a complaint. Even now, Crofoot does not

---

[23]    When "disability is not established prior to the date last insured, . . . , it 'ha[s] the practical effect of foreclosing receipt of any benefits ....'" *Callahan v. Astrue*, No. 09-CV-1441 (TJM/DRH), 2011 WL 2517022, at *8 (N.D.N.Y. May 5, 2011) (quoting *Dutcher v. Astrue*, No. 09-CV1161 (LEK/VEB), 2011 WL 1097860, at *2 (N.D.N.Y. Mar. 7, 2011).

[24]    A CPAP titration study is an in-lab sleep study used to calibrate continuous positive airway pressure (CPAP) therapy. CPAP also is a common treatment used to manage sleep-related breathing disorders including obstructive sleep apnea, central sleep apnea and hypoventilation and hypoxemia. *See* http://www.sleepeducation.com/disease-management/cpap-titration-study/overview (last visited May 6, 2013).

set forth any functional limitations related to sleep apnea or suggest there is any further medical evidence of the same.

Crofoot has not shown that sleep apnea played any part in his alleged disability, and ALJ Gonzalez committed no reversible error by not factoring sleep apnea into his residual functional capacity assessment.

## 2.  ALJ's Interpretation of Medical Evidence

Crofoot argues that ALJ Gonzalez's residual functional capacity determination represents improper *lay interpretation* of the medical evidence. (Dkt. No. 11, pp. 12-13).  ALJ Gonzalez stated that "*[t]he medical evidence is weak and supports a residual functional capacity for light work . . . .*" (T. 18) (emphasis added).  Crofoot perceives this statement as indicating that ALJ Gonzalez felt that, because of weak medical evidence, he must make his own residual functional capacity assessment.  Further, Crofoot argues that no medical opinion evidence of record was consistent with ALJ Gonzalez's ultimate residual functional capacity determination.

Crofoot correctly asserts that an administrative law judge cannot substitute his lay judgment for competent medical opinion.  Indeed, "it is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. . . . [W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (internal citations omitted).  Crofoot's argument that ALJ Gonzalez erred in this respect is not persuasive, however.  The natural reading of ALJ Gonzalez's statement quoted above is that he considered medical evidence

of *disability* "weak," not evidence regarding *residual functional capacity*. Indeed, ALJ Gonzalez expressly stated that *medical evidence* "supports a residual functional capacity for light work." Thus, there is no basis for the court to conclude that ALJ Gonzalez deliberately substituted his lay opinion for competent medical opinion.

Crofoot's argument that no medical opinion evidence is consistent with ALJ Gonzalez's residual functional capacity determination also is not persuasive. While ALJ Gonzalez was not free to construct a residual functional capacity assessment out of whole cloth, he was free to choose between properly submitted medical opinions and other competent evidence to piece together an overall assessment. It is not required that his assessment be wholly consistent with any one opinion.

In any event, ALJ Gonzalez's assessment is consistent with and supported by available evidence. On July 15, 2009, state disability analyst, C. Rosney, prepared a physical RFC assessment based on a review of all of Crofoot's medical records. C. Rosney concluded that Crofoot can perform *light work* with certain limitations.[25] (T. 712-17). Dr. Malhotra, who performed a consultative orthopedic examination, found no objective evidence of limitation from an orthopedic perspective. (T. 686-91). None of the other medical sources made findings or expressed opinions inferring that Crofoot's impairments preclude him from engaging in physical activities of light work. (*See* footnote 9, *supra*, for requirements of light work.) Neither does any objective medical evidence support an inference that additional limitations on Crofoot's capacity for light

---

[25]    "[A]n ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability." *Baszto v. Astrue*, 700 F. Supp.2d 242, 249 (N.D.N.Y. 2010)(further support for ALJ's assessment is found in State Agency review consultant's determination).

work imposed by ALJ Gonzalez are inadequate to account for Crofoot's chronic shoulder, neck and back pain.

Finally, Crofoot points to no objective evidence of *functional limitations* preventing his performance of a limited range of light work. Dr. Booker (physical medicine and rehabilitation) diagnosed Crofoot with cervical radiculopathy under sub-optimal control, and arm pain under sub-optimal control (T. 841). But, he also opined, any associated pain *does not interfere with Crofoot's activities of daily living.* (T. 858). Dr. Tomlinson noted reduced left shoulder range of motion as well as positive results on some tests. He further reported, however, that an x-ray of Crofoot's left shoulder showed no abnormality, and a magnetic resonance imaging ("MRI") of that shoulder showed no tears. (T. 824). Finally, he observed that "his pain from impingement improved with injection." *Id.* This evidence, while at variance with Dr. Malhotra's opinion diagnostically, does not contradict it from the standpoint of *functional effects*.

There is no justification for concluding that the physical residual functional capacity determination was flawed because based on improper lay interpretation of medical evidence.

## VI. Point Three: Weighing of Subjective Complaints

Crofoot testified that his symptoms "go in a cycle." (T. 40-41). His neck impairment creates "total stiffness" and pain on a weekly basis. (T. 41). Crofoot also claimed that he gets "burning in [his] back. . . ." (T. 42). He claims he awakens with back pain which gets him "in his testicle." (T. 45). He also has chest pains, and his left arm "has been dead for 10 years, . . . ." (T. 42). He further claims that his right side seems to "lock up," and he cannot hold

anything of great weight. *Id.* He cannot sit at a computer for very long because he gets uncomfortable and "everything goes numb." *Id.* Despite corrective surgeries, his knees still bother him. Cold, damp days affect him differently with his ability to bend to pick up. (T. 46). He only gets four hours of sleep when he is lucky (T. 47-48), and "cannot hear worth a crap." (T. 51).

ALJ Gonzalez substantially discounted this testimony, finding that Crofoot's activities of daily living, his statement that he would not have filed for benefits but for his economic situation, his attempts to continue working, and inconsistent statements about computer literacy all undercut his credibility. ALJ Gonzalez concluded, therefore, that Crofoot's statements regarding his symptoms are "not credible *to the extent they are inconsistent with the above residual functional capacity assessment.*" (T. 20) (emphasis added).

Crofoot attacks this summary statement as indicating legal error, *viz.*, gauging credibility of subjective testimony by comparing it to a predetermined residual functional capacity rating. Crofoot also challenges specific reasons given for discounting Crofoot's subjective complaints. (Dkt. No. 11, pp. 15-18).

A.    *Credibility Assessment–Subjective Testimony*

Pain is an important element in disability claims, and pain evidence must be thoroughly considered. *See Ber v. Celebrezze*, 332 F.2d 293, 298–99 (2d Cir. 1964). The best-informed (sometimes only) source of information regarding intensity, persistence and limiting effects of pain and other potentially disabling symptoms is the person who suffers therefrom. Testimony from claimants, therefore, is not only relevant, but desirable.

On the other hand, such testimony is subjective and may be colored by the claimant's interest in obtaining a favorable outcome. Hence, subjective

symptomatology by itself cannot be the basis for a finding of disability.  A claimant must present medical evidence or findings that the existence of an underlying condition could reasonably be expected to produce the symptoms alleged.[26]

An ALJ must decide how much weight to give claimants' subjective self-evaluations.  The Commissioner provides explicit guidance in this area.  First, a formally promulgated regulation requires—once an impairment is identified—consideration of seven specific, objective factors that naturally support or impugn subjective testimony of disabling pain and other symptoms.[27]

Second, SSR 96–7p directs ALJs to follow a two-step process to evaluate claimants' allegations of pain:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment(s) . . . that could reasonably be expected to produce the individual's pain or other

---

[26]    *See* 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1529; SSR 96–7p, POLICY INTERPRETATION RULING TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at *2 (SSA July 2, 1996); SSR 96–4p, TITLES II AND XVI: SYMPTOMS, MEDICALLY DETERMINABLE PHYSICAL AND MENTAL IMPAIRMENTS, AND EXERTIONAL AND NONEXERTIONAL LIMITATIONS, 61 Fed. Reg. 34488-01, 34489, 1996 WL 362210 (SSA July 2, 1996).

[27]    An ALJ must evaluate a claimant's symptoms, including pain, based on medical and other evidence, including he following factors:

(i)    claimant's daily activities;
(ii)   location, duration frequency, and intensity of claimant's pain or other symptoms;
(iii)  precipitating and aggravating factors;
(iv)   type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate her pain or other symptoms;
(v)    treatment, other than medication, claimant receives or has received for relief of her pain or other symptoms;
(vi)   measures claimant uses or has used to relieve pain or other symptoms; and
(vii)  other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms.

*See* 20 C.F.R. § 404.1529(c).

symptoms . . . .

> Second, . . . the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities . . . .

SSR 96–7, 1996 WL 374186, at *2. The Ruling further provides that "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." *Id.*

Governing circuit law generally mirrors the Commissioner's Ruling. Thus, when an ALJ rejects a claimant's testimony of pain and limitations, he or she must provide explicit reasons for rejecting the testimony. *See Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988); *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983).[28]

## B.  *Judicial Review of Credibility Choices*

Administrative law judges (who usually have the only opportunity to observe witnesses' demeanor, candor, fairness, intelligence and manner of testifying) obviously are best-positioned to make accurate credibility determinations. *See Campbell*, 465 Fed. App'x at 7 (function of Commissioner, not the court, to appraise credibility); *see also Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999) (stating that deference is given to ALJ's decision because he is in the best position to assess the claimant's credibility). Consequently, reviewing courts are loathe to second-guess and overturn credibility choices made by an

---

[28]  When an ALJ neglects to employ proper legal standard, a court cannot subject his credibility determination to meaningful review. *See Meadors v. Astrue*, 370 Fed. App'x 179, 184-85 (2d Cir.2010)

administrative adjudicator.  *See Pietrunti v. Director, Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) ("Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.'"); *Aponte v. Secretary, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."); *see also Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) ("Normally, [the court] give[s] an ALJ's credibility determinations special deference because the ALJ is in the best position to see and hear the witness.").

Reviewing courts, however, cannot abdicate their statutory duty to determine whether correct principles of law were applied and whether challenged decisions are supported by substantial evidence.  Consequently, even credibility choices are examined in that limited context.

C.    *Application and Analysis*

Credibility-determination boilerplate such as *not credible to the extent inconsistent with the above residual functional capacity* is, at best, gibberish insusceptible to meaningful judicial review.  Crofoot's brief cites numerous cases criticizing this gobbledygook for various reasons, the most serious being that it smacks of determining residual functional capacity before even considering a claimant's subjective testimony.  On the other hand, reviewing courts do not demand perfect decisions, and "[w]hile this sort of boilerplate is inadequate, by itself, to support a credibility finding, . . . its  use, does not make a credibility determination invalid." *Adams v. Astrue*, No. 10C7849, 2012 WL 3065299, at *9 (N.D. Ill. July 20, 2012) (internal citations omitted).  The determinative question is not whether ALJ Gonzalez used meaningless and opaque language when

expressing his credibility choice, but whether he explained how Crofoot's subjective testimony is not supported or undermined by other evidence, and whether the ultimate credibility finding is supported by substantial evidence. *See Richison v. Astrue*, 462 Fed. App'x 622, 625-26 (7th Cir. 2011) (despite ALJ's recitation of boilerplate language, ALJ provided a sufficient basis for his credibility assessment).

ALJ Gonzalez's opinion demonstrates that he considered the objective factors identified in the above Regulation to the extent there was evidence thereof (T. 17-18), engaged in the two-step process as required by the applicable Ruling, and articulated specific reasons for finding Crofoot's subjective complaints not fully credible, all as required by circuit law. (T. 20). Thus, there is no obvious structural legal error in ALJ Gonzalez's approach to assessing credibility of Crofoot's subjective testimony regarding persistence, intensity and limiting effects of his symptoms. This point of error thus collapses into a disagreement with the evidentiary bases for AlJ Gonzalez's finding that Crofoot's subjective testimony was not credible.

ALJ Gonzalez stated that Crofoot's allegations "were not credible as it appears that his reports were grossly exaggerated." (T. 18). ALJ Gonzalez came to this conclusion after thoroughly explicating the objective medical evidence. ALJ Gonzalez explained that "[t]he fact that he did not report such acute symptoms to his treating doctors discredits his testimony." (T. 18). He further observed that Crofoot testified that if it were not for his economic condition, he would not have filed for disability, which, ALJ Gonzalez opined, "clearly indicat[es] that he filed for benefits because of his economic situation and not his health situation." *Id*. He noted that Crofoot disclosed during his consultative

psychological evaluation "essentially normal daily activities." (T. 20). Crofoot drove, shopped, socialized, managed money, went to his real estate brokerage office daily, and exercised. (T. 19). Crofoot told Dr. Winchester-Penny that he was trying to lose weight by dieting and lifting weights. (T. 817). In June 2009, Crofoot told Dr. Booker that his occupation was selling real estate. (T. 724, 859). Similarly, Crofoot told Dr. Gindes in May 2009, that he was self-employed as a real estate broker and had been going to the office since January 2009, but had not generated any business, which provides further support for ALJ Gonzalez's credibility determination. (T. 19, 677).

While some of the reasons given by ALJ Gonzalez are weak, even petty, each has an evidentiary basis "more than a scintilla." None is so patently cockamamie or otherwise infirm that a reviewing court must conclude that no reasonable mind could accept it as adequate to support a conclusion. Thus, the credibility choice survives judicial review under the highly deferential substantial evidence standard. (T. 17-20). It is not the prerogative of the court to reweigh credibility choices, even when it would come to a different conclusion.

There is no basis, therefore to reverse the Commissioner's decision because of a legal or evidentiary error in assessing Crofoot's credibility.

## VII.  Point Four:  Past Relevant Work

Before onset of Crofoot's alleged disability, he engaged in substantial gainful employment as a real estate agent. (T. 18). At Step 4 of the sequential analysis process, ALJ Gonzalez found that a person with Crofoot's residual functional capacity can perform work of a real estate agent as it is generally performed. (T. 20). Under that evaluative rubric, a finding of capacity to perform past relevant work mandates a conclusion of "not disabled."

Crofoot argues that ALJ Gonzalez's Step 4 determination is flawed because: (1) errors in the earlier residual functional capacity and credibility determinations render the Step 4 determination unsupported by substantial evidence; and (2) ALJ Gonzalez failed to make explicit findings as to the physical and mental demands of Crofoot's prior work, which renders his Step 4 finding further unsupported by substantial evidence. (Dkt. No. 11, pp.18-19). Inasmuch as the first prong of this argument is moot under earlier analyses, only the second prong needs examination here.

A.    *Assessing Ability to Perform Past Relevant Work*

"[I]n the fourth stage of the [disability ] inquiry, the claimant has the burden to show an inability to return to h[is] previous specific job and an inability to perform h[is] past relevant work generally." *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003); *see also Christiana*, 2008 WL 759076, at *3 (claimant has the burden of showing that she cannot perform past relevant work). In other words, claimants are not disabled when they can perform their past relevant work, either as they actually performed it, or as it is generally performed in the national economy. *See* SSR 82–61, 1982 WL 31387, at *2 (1982); *Jock v. Harris*, 651 F.2d 133, 135 (2d Cir. 1981).

In making this determination, "[a]n ALJ may rely on the claimant's statements, which 'are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work.' " *Kochanek v. Astrue*, No. 08-CV-310 (GLS/VEB), 2010 WL 1705290, at *11 (N.D.N.Y. Apr. 13, 2010) (quoting SSR 82–62, 1982 WL 31386, at *3). An administrative law judge may also consult with a vocational expert witness who can provide evidence of "the physical and mental demands of a claimant's past relevant work, either as

the claimant actually performed it or as generally performed in the national economy." 20 C.F.R. § 404.1560(b)(2). Finally, there are other evidentiary sources that the Commissioner recognizes as authoritative. The *Dictionary of Occupational Titles*, published by the United States Department of Labor, is a comprehensive listing of job titles in the United States. Detailed descriptions of requirements for each job include assessments of exertional level and reasoning ability necessary for satisfactory performance of the work. For Social Security proceedings, the Commissioner routinely takes administrative notice of job information contained therein when determining whether work exists in significant numbers in the national economy which the claimant can perform at his or her residual functional capacity. *See Townley v. Heckler*, 748 F.2d 109, 113 (2d Cir. 1984); *Martell v. Commissioner of Soc. Sec.*, No. Civil Action 2:12–CV–152, 2013 WL 1429459, at *6 (D. Vt. Mar. 22, 2013) ("ALJs may rely on job descriptions contained in the DOT to define how jobs are "usually performed in the national economy."); *see also* 20 C.F.R. § 404.1566(d)(1), 404.1566(e), 416.966(d)(1), 416.966(e); SSR 00-4p, 2000 WL 1898704, at *1-2.

B.     *Application and Analysis*

Here, ALJ Gonzalez compared Crofoot's residual functional capacity for work-related activity with the physical and mental demands of employment as a real estate agent as that work is customarily performed according to the Dictionary of Occupational Titles. That authoritative source indicates that the position of real estate agent customarily is performed at the light exertional level. *See* Dictionary of Occupational Titles, Code 250.357-018, 1991 WL 672361 (4th ed. 1991). Further, such work does not require overhead reaching with an upper extremity, frequent postural positioning, or exposure to respiratory irritants or dangerous conditions. (T. 20).

On the other hand, Crofoot (who has the burden of establishing that he lacks the functional capacity to perform his past relevant work) does not present any argument or identify any facts indicating that ALJ Gonzalez's findings were inaccurate—*i.e.*, that he could not perform his prior work as a real estate agent either as he actually performed it or as it is generally performed.

In light of the foregoing, the court has no basis to conclude that ALJ Gonzalez's Step 4 determination was erroneous for lack of substantial evidence.

## VIII.   Recommendation

Plaintiff's request to remand this action should be **DENIED**.   The Commissioner's decision should be **AFFIRMED**.

## IX.   Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the ___8___ day of _____May_____ 2013.

_____
Earl S. Hines
United States Magistrate Judge